1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   JONELLE McCROREY; JEFF McCROREY
and DANELLE McCROREY, husband and wife,

11                        Plaintiffs,                    No.

12          v.                                           VERIFICATION OF STATE
                                                         COURT RECORDS
13   FEDERAL NATIONAL MORTGAGE
ASSOCIATION; NATIONSTAR MORTGAGE;
14   FLAGSTAR BANK, F.S.B.; MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS,
15   INC.,

16                        Defendants.

17

18          I am counsel for Defendant Flagstar Bank, F.S.B. in the above-captioned action.  I hereby

19   verify, pursuant to Local Rule W.D. Wash. 101, that true and correct copies of all pleadings and

20   other papers filed in the Snohomish County Superior Court action are attached hereto as

21   Exhibit A.  This verification is being filed within 14 days of the filing of the Notice of Removal,

22   pursuant to Local Rule 101.

23
24
25
26
27

VERIFICATION OF STATE COURT RECORDS— 1
DWT 20375743v1 0093128-000024

1    DATED this 20th day of September, 2012.

2                              Davis Wright Tremaine LLP
                               Attorneys for Defendants Flagstar Bank, FSB
3

4    By  /s/ Josh Rataezyk
                               Fred B. Burnside, WSBA #32491
5                              Josh Rataezyk, WSBA #33046
                               1201 Third Avenue, Suite 2200
6                              Seattle, Washington 98101-3045
                               Telephone: 206-622-3150 | Fax: 206-757-7700
7                              Email:  fredburnside@dwt.com
                                       joshrataezyk@dwt.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

VERIFICATION OF STATE COURT RECORDS— 2
DWT 20375743v1 0093128-000024

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I caused a copy of the foregoing to be served upon the following counsel of record in the manner indicated:

Wesley Foreman          ☐ Messenger
Triad Law Group        ☒ Overnight U.S. Mail, postage prepaid
209 Dayton Street, Suite 105    ☐ Federal Express
Edmonds, Washington 98020   ☐ Facsimile
*Wesley.Foreman@TriadLawGroup.com*   ☒ Email

Declared under penalty of perjury under the laws of the state of Washington at Seattle, Washington this 20th day of September, 2012.

Davis Wright Tremaine LLP
Attorneys for Flagstar Bank, FSB.

By */s/Josh Rataezyk*
     Josh Rataezyk, WSBA #33046
     1201 Third Avenue, Suite 2200
     Seattle, Washington 98101-3045
     Telephone: (206) 622-3150
     Fax: (206) 757-7700
     E-mail: joshrataezyk@dwt.com

VERIFICATION OF STATE COURT RECORDS— 3
DWT 20375743v1 0093128-000024

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700



CL15775797

FILED

2012 AUG 21  AM 9:28

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

*Snohomish*   **CASE TYPE 2   12   2   07402   8**

**COUNTY SUPERIOR COURT**

**CASE INFORMATION COVER SHEET**

**Case Number** _____   **Case Title** *McCRorey et al* v. *FNMA et al*

**Attorney Name** *Wesley Foreman* _____   **Bar Membership Number** _____ *44269*

Please check one category that best describes this case for indexing purposes. Accurate case indexing not only saves time in docketing new cases, but helps in forecasting needed judicial resources. Cause of action definitions are listed on the back of this form. Thank you for your cooperation.

**APPEAL/REVIEW**
___ Administrative Law Review (ALR 2)
___ Appeal of a Department of Licensing Revocation (DOL 2)
___ Civil, Non-Traffic (LCA 2)
___ Civil, Traffic (LCI 2)

**CONTRACT/COMMERCIAL**
___ Breach of Contract (COM 2)
___ Commercial Contract (COM 2)
___ Commercial Non-Contract (COL 2)
___ Third Party Collection (COL 2)

**MERETRICIOUS RELATIONSHIP**
___ Meretricious Relationship (MER 2)

**PROTECTION ORDER**
___ Civil Harassment (HAR 2)
___ Domestic Violence (DVP 2)
___ Foreign Protection Order (FPO 2)
___ Sexual Assault Protection (SXP 2)
___ Vulnerable Adult Protection (VAP 2)

**JUDGMENT**
___ Abstract Only (ABJ 2)
___ Foreign Judgment (FJU 2)
___ Judgment, Another County (ABJ 2)
___ Judgment, Another State (FJU 2)
___ Tax Warrant (TAX 2)
___ Transcript of Judgment (TRJ 2)

**OTHER COMPLAINT/PETITION**
___ Action to Compel/Confirm Private Binding Arbitration (MSC 2)
___ Change of Name (CHN 2)
___ Deposit of Surplus Funds (MSC 2)
___ Emancipation of Minor (EOM 2)
___ Injunction (INJ 2)
___ Interpleader (MSC 2)
___ Malicious Harassment (MHA 2)
___ Minor Settlement (No guardianship) (MST 2)
___ Petition for Civil Commitment (Sexual Predator)(PCC 2)
___ Seizure of Property from Commission of Crime (SPC 2)
___ Seizure of Property Resulting from a Crime (SPR 2)
___ Subpoenas (MSC 2)

**PROPERTY RIGHTS**
___ Condemnation (CON 2)
☒ Foreclosure (FOR 2)

___ Land Use Petition (LUP 2)
___ Property Fairness (PFA 2)
___ Quiet Title (QTI 2)
___ Unlawful Detainer (UND 2)

**TORT, MEDICAL MALPRACTICE**
___ Hospital (MED 2)
___ Medical Doctor (MED 2)
___ Other Health Care Professional (MED 2)

**TORT, MOTOR VEHICLE**
___ Death (TMV 2)
___ Non-Death Injuries (TMV 2)
___ Property Damage Only (TMV 2)
___ Victims of Motor Vehicle Theft (VVT 2)

**TORT, NON-MOTOR VEHICLE**
___ Asbestos (PIN 2)
___ Other Malpractice (MAL 2)
___ Personal Injury (PIN 2)
___ Products Liability (TTO 2)
___ Property Damage (PRP 2)
___ Wrongful Death (WDE 2)

**WRIT**
___ Habeas Corpus (WHC 2)
___ Mandamus (WRM 2)
___ Restitution (WRR 2)
___ Review (WRV 2)
___ Miscellaneous Writs (WMW 2)

**IF YOU CANNOT DETERMINE THE APPROPRIATE CATEGORY, PLEASE DESCRIBE THE CAUSE OF ACTION BELOW.**

FILED

**FILED**

2012 AUG 21  AM 9: 27

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

CL15775796

Snohomish County Superior Court
Sonya Kraski
County Clerk
Everett WA

12-2-07402-8

| Rcpt. Date | Acct. Date | Time |
|---|---|---|
| 08/21/2012 | 08/21/2012 | 09:23 AM |

Receipt/Item #    Tran-Code   Docket-Code
2012-01-21786/01    1100      SFFR
Cashier: EKH

Paid By: TRIAD LAW GROUP, PS
Transaction Amount:              $240.00

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| Jonelle McCrorey; Jeff McCrorey and Danelle McCrorey, Husband and Wife, <br><br> Plaintiffs, <br><br> vs. <br><br> Federal National Mortgage Association; Nationstar Mortgage; Flagstar Bank, F.S.B.; Mortgage Electronic Registration Systems, Inc., <br><br> Defendants. | NO. **12  2  07402  8** <br><br> **SUMMONS** |

THE STATE OF WASHINGTON TO: **FEDERAL NATIONAL MORTGAGE ASSOCIATION**

A lawsuit has been started against you in the above-entitled court by the above-named

plaintiffs. Plaintiffs' claims are stated in the written complaint, a copy of which is served upon

you with this summons.

To defend against this lawsuit, you must respond to the complaint by stating your defenses

in writing, and serve a copy upon the undersigned attorney for plaintiffs within twenty (20)

days after the service of this summons upon you, excluding the day of service, if served within

the State of Washington, or within sixty (60) days after service if served outside the State of

SUMMONS - 1

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867



1   Washington, or a default judgment will be entered against you without notice.  A default

2   judgment is one where the plaintiffs are entitled to what they ask for because you have not

3   responded.  If you serve a Notice of Appearance on the undersigned attorney, you are entitled

4   to notice before a default judgment may be entered.

5        You may demand that plaintiff file this lawsuit with the Court.  If you do so, the demand

6   must be in writing and must be served upon the person signing the summons.  Within fourteen

7   (14) days after you serve the demand, plaintiffs must file this lawsuit with the Court, or the

8   service upon you of this summons and complaint will be void.

9        If you wish to seek the advice of an attorney in this matter, you should do so promptly so

10  that your written response, if any, may be served on time.

11       This summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of

12  Washington.

13

14       DATED this ___14___ day of August 2012.

15

16            TRIAD LAW GROUP

17

18            _Wesley Foreman_____

19            Wesley Foreman, WSBA #44269
             Attorney for Plaintiff

20

21

22

23

24

25

SUMMONS - 2

FILED

:2012 AUG 21  AM 9:28

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| Jonelle McCrorey; Jeff McCrorey and Danelle McCrorey, Husband and Wife, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| Federal National Mortgage Association; Nationstar Mortgage; Flagstar Bank, F.S.B.; Mortgage Electronic Registration Systems, Inc., | ) ) ) ) |
| Defendants. | ) ) ) |

NO. **12  2  07402  8**

**SUMMONS**

THE STATE OF WASHINGTON TO: **FLAGSTAR BANK, F.S.B.**

A lawsuit has been started against you in the above-entitled court by the above-named

plaintiffs. Plaintiffs' claims are stated in the written complaint, a copy of which is served upon

you with this summons.

To defend against this lawsuit, you must respond to the complaint by stating your defenses

in writing, and serve a copy upon the undersigned attorney for plaintiffs within twenty (20)

days after the service of this summons upon you, excluding the day of service, if served within

the State of Washington, or within sixty (60) days after service if served outside the State of

Washington, or a default judgment will be entered against you without notice.  A default

SUMMONS - 1

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

judgment is one where the plaintiffs are entitled to what they ask for because you have not responded. If you serve a Notice of Appearance on the undersigned attorney, you are entitled to notice before a default judgment may be entered.

You may demand that plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing the summons. Within fourteen (14) days after you serve the demand, plaintiffs must file this lawsuit with the Court, or the service upon you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 14 day of August 2012.

TRIAD LAW GROUP

Wesley Foreman, WSBA #44269
Attorney for Plaintiff

SUMMONS - 2

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

FILED

2012 AUG 21   AM 9: 28

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| Jonelle McCrorey; Jeff McCrorey and Danelle McCrorey, Husband and Wife, | NO. **12   2   07402   8** |
| Plaintiffs, | **SUMMONS** |
| vs. | |
| Federal National Mortgage Association; Nationstar Mortgage; Flagstar Bank, F.S.B.; Mortgage Electronic Registration Systems, Inc., | |
| Defendants. | |

THE STATE OF WASHINGTON TO: **MORTGAGE ELECTRONIC REGISTRATION**

**SYSTEMS, INC.**

A lawsuit has been started against you in the above-entitled court by the above-named

plaintiffs. Plaintiffs' claims are stated in the written complaint, a copy of which is served upon

you with this summons.

To defend against this lawsuit, you must respond to the complaint by stating your defenses

in writing, and serve a copy upon the undersigned attorney for plaintiffs within twenty (20)

days after the service of this summons upon you, excluding the day of service, if served within

the State of Washington, or within sixty (60) days after service if served outside the State of

SUMMONS - 1

**TRIAD LAW GROUP**
209 Dayton Street. Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

1   Washington, or a default judgment will be entered against you without notice. A default

2   judgment is one where the plaintiffs are entitled to what they ask for because you have not

3   responded. If you serve a Notice of Appearance on the undersigned attorney, you are entitled

4   to notice before a default judgment may be entered.

5        You may demand that plaintiff file this lawsuit with the Court. If you do so, the demand

6   must be in writing and must be served upon the person signing the summons. Within fourteen

7   (14) days after you serve the demand, plaintiffs must file this lawsuit with the Court, or the

8   service upon you of this summons and complaint will be void.

9        If you wish to seek the advice of an attorney in this matter, you should do so promptly so

10  that your written response, if any, may be served on time.

11       This summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of

12  Washington.

13

14       DATED this __14__ day of August 2012.

15

16                          TRIAD LAW GROUP

17

18

19                          Wesley Foreman, WSBA #44269
                            Attorney for Plaintiff

20

21

22

23

24

25

SUMMONS - 2

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

FILED

2012 AUG 21   AM 9: 26

SOHYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| Jonelle McCrorey; Jeff McCrorey and Danelle McCrorey, Husband and Wife, | ) ) | NO. **12   2   07402   8** |
|---|---|---|
| Plaintiffs, | ) ) ) | **SUMMONS** |
| vs. | ) ) | |
| Federal National Mortgage Association; Nationstar Mortgage; Flagstar Bank, F.S.B.; Mortgage Electronic Registration Systems, Inc., | ) ) ) ) | |
| Defendants. | ) ) ) | |

THE STATE OF WASHINGTON TO: **NATIONSTAR MORTGAGE**

A lawsuit has been started against you in the above-entitled court by the above-named plaintiffs. Plaintiffs' claims are stated in the written complaint, a copy of which is served upon you with this summons.

To defend against this lawsuit, you must respond to the complaint by stating your defenses in writing, and serve a copy upon the undersigned attorney for plaintiffs within twenty (20) days after the service of this summons upon you, excluding the day of service, if served within the State of Washington, or within sixty (60) days after service if served outside the State of Washington, or a default judgment will be entered against you without notice. A default

SUMMONS - 1

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

judgment is one where the plaintiffs are entitled to what they ask for because you have not responded. If you serve a Notice of Appearance on the undersigned attorney, you are entitled to notice before a default judgment may be entered.

You may demand that plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing the summons. Within fourteen (14) days after you serve the demand, plaintiffs must file this lawsuit with the Court, or the service upon you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 14 day of August 2012.

TRIAD LAW GROUP

Wesley Foreman, WSBA #44269
Attorney for Plaintiff

SUMMONS - 2

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| Jonelle McCrorey; Jeff McCrorey and Danelle McCrorey, Husband and Wife,<br><br>Plaintiffs,<br><br>vs.<br><br>Federal National Mortgage Association; Nationstar Mortgage; Flagstar Bank, F.S.B.; Mortgage Electronic Registration Systems, Inc.,<br><br>Defendants. | NO. **12  2  07402  8**<br><br>**COMPLAINT** |

Plaintiffs Jonelle McCrorey, Jeff McCrorey and Danelle McCrorey through counsel Wesley Foreman and Triad Law Group, hereby allege, aver, and complain against defendants as follows:

## I. PARTIES

1.   Plaintiffs Jonelle McCrorey, Jeff McCrorey and Danelle McCrorey ("Plaintiffs") are residents of Snohomish County, Washington and the former owners of property located at 1820 Crestwell Road, Snohomish, Washington ("Property").

2.   Defendant Federal National Mortgage Association ("Fannie Mae") is a government-owned enterprise doing business in Washington state and Snohomish County, Washington.

3.   Defendant Nationstar Mortgage ("Nationstar") is an organization headquartered outside

**COMPLAINT - 1**

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

of Washington State, doing business in Snohomish County, Washington.

4. Defendant Flagstar Bank, F.S.B. ("Flagstar") is an organization headquartered outside of Washington State, doing business in Snohomish County, Washington.

5. Defendant Mortgage Electronic Registration System (MERS) is a Delaware corporation doing business in the state of Washington, and in Snohomish County, Washington.

## II. JURISDICTION AND VENUE

6. Venue is proper in Snohomish County, as the property which is the subject of this dispute is located in Snohomish, Washington. Additionally, the plaintiffs reside in Snohomish, Washington.

## III. STATEMENT OF FACTS

7. On or about September 27, 2007, the plaintiffs signed a Promissory Note so as to purchase the property. *See* Exhibit A, Note.

8. Also, on or about September 27, 2007, the plaintiffs executed a corresponding Deed of Trust. See Exhibit B, Deed of Trust

9. The original lender is listed as "Simply Mortgage, Inc." *See Id.*, p.1.

10. The original Trustee was "Joan H. Anderson, EVP on behalf of Flagstar Bank, FSB." *See Id.*, p.2

11. Also listed on the Deed of Trust is MERS. The Deed of Trust provides as follows: "MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns." *Id.*

12. MERS is also identified as the "beneficiary" under the Deed of Trust documents. *Id.*

13. In late 2008 because of the downturn of the economy, the plaintiffs began having trouble making the mortgage payments.

14. In January 2009, the Plaintiffs were advised by Flagstar that they could seek a loan modification.

15. On February 3, 2009, an Assignment Deed of Trust was recorded. This document was executed by MERS, assigning beneficial interest in the plaintiffs' loan to Flagstar Bank, FSB, "for value received." This document was executed on January 26, 2009 by MERS "Vice President" "Robert. R. Stoudemire." *See* Exhibit C. Assignment 1.

16. Plaintiffs made numerous attempts to initiate the loan modification process, but it took six months before Flagstar responded and began the application.

**COMPLAINT** - 2

TRIAD LAW GROUP
209 Dayton Street. Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

17. The Plaintiffs were offered a three month trial period in which they were promised that after paying approximately $3500 for three months, they would receive a loan modification.

18. The plaintiffs made the three $3500 payments.

19. After the third payment, Flagstar told them to send an additional $3500 payment, which the plaintiffs did.

20. After the fourth $3500 "trial" payment, Flagstar told the plaintiffs that their loan had been sold to Nationstar.

21. Plaintiffs inquired with Flagstar as to when their loan modification would start, they were told that because Flagstar had sold their loan to Nationstar, the plaintiffs would need to seek a loan modification with Nationstar.

22. The plaintiffs waited six months, and were told by Nationstar that Flagstar never provided them with any paperwork on their old loan modification.

23. Finally. Nationstar took an application for a loan modification, and told the plaintiffs that their income was too high for them to receive a loan modification. At that point, Jeff McCrorey had just started a new job, and collectively, the plaintiffs had many old bills to pay.

24. Jeff McCrorey was laid off again near the end of 2010, and Nationstar now said the plaintiffs could qualify for a loan modification.

25. The terms of the offered loan modification included monthly payments of approximately $5700, nearly $2600 more than their original payment amount of $3104.61. This was an amount the plaintiffs could never have been able to afford.

26. Nationstar also proposed adding over $65,000 to the principle of the loan, which was $409,000 at the time. At this point, plaintiffs know that the home was worth at or about $300,000.

27. On September 3, 2010, a second Assignment Deed of Trust was recorded. This document was executed by MERS, assigning beneficial interest to "NationStar Mortgage," "for value received." This document was executed by "Matthew Barrett," signing on behalf of MERS "as nominee for Simply Mortgage, Inc., it's successors and assigns." See Exhibit D, Assignment 2.

28. On September 22, 2010, an Appointment of Successor Trustee document was recorded,

**COMPLAINT - 3**

TRIAD LAW GROUP
209 Dayton Street. Suite 105
Edmonds. WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

in which "Nationstar Mortgage LLC, by Quality Loan Service Corporation of Washington, as its attorney in fact," appointed Quality Loan Service of Corporation of Washington as Successor Trustee. This document was executed by "Rodney McCumsey, Assistant Secretary." *See* Exhibit E, Appointment of Successor Trustee.

29. On June 24, 2011, a third Assignment Deed of Trust was recorded. This document was executed by "Nationstar Mortgage LLC, by Quality Loan Service Corporation of Washington, as its attorney in fact," assigning beneficial interest to Fannie Mae "for value received." This document was executed by "Rodney McCumsey, Assistant Secretary." This document was executed on September 14, 2010, but was not recorded for nine months. *See* Exhibit F, Assignment 3.

30. Plaintiffs' property was sold on June 17, 2011, at a Trustee's Sale held by Quality Loan Service, in which Fannie Mae purchased the property.

### IV. FIRST CAUSE OF ACTION, AGAINST ALL DEFENDANTS: Violations of Washington's Deed of Trust Act including Wrongful Foreclosure

31. Plaintiffs hereby repeat and incorporate by reference all of the preceding paragraphs in the complaint as if fully set forth herein.

32. Washington law defines the "Beneficiary" in the Deed of Trust Act as follows: "[T]he holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation." RCW 61.24.005 (2).

33. MERS is identified in the Deed of Trust documents as the "beneficiary" under the Deed of Trust. *See* Exhibit B, p.2.

34. This case features two Assignment Deed of Trust documents which were executed by MERS, rather than the actual beneficiary as defined under Washington law at the time. *See* Exhibits C and D.

35. In the Plaintiffs' Note, it states: "I understand that the Lender [Simply Mortgage, Inc.] may transfer this note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder.'" *See* Exhibit A, p.1.

36. The Deed of Trust documents also state as follows (in the paragraph after the legal description and property address):

COMPLAINT - 4

TRIAD LAW GROUP
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

> **Borrower understands and agrees that MERS hold only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any legal action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.** *See* Exhibit A, p.4

37. The term "nominee" is nowhere defined in the actual Deed of Trust and is therefore *per se* ambiguous.

38. The simultaneous claims that "MERS is the beneficiary" coupled with the claim that MERS is "acting solely as nominee for Lender" are in contravention to one another. These claims are designed to create confusion and an ever shifting fabric of foreclosure liability in favor of MERS and its members.  *See Id.*

39. MERS is not a bank, it lends no money and it bears no risk of loss.  MERS is not a beneficiary as defined as Washington because of the nature of its operation, where it never acquires a beneficial interest.

40. As stated in the Note, the Lender and its assigns are the "Note Holder," which is the "beneficiary" under RCW 61.24.005(2).

41. The court is asked to take judicial notice of paragraphs 42-43 contained in this section of the Complaint, citing an order of the United States Office Department of the Treasury, Office of the Comptroller of the Currency which address serious deficiencies in the way MERS goes about its business.  Also see the enclosed Request for Judicial Notice.

42. After being closely scrutinized, MERS and its parent corporation MERSCORP, Inc. ("MERSCORP") consented to the issuance of the following language which is contained on page five of the agreed-on consent order:

> **(4) In connection with services provided to Examined Members related to tracking and registering residential mortgage loans and initialing foreclosures ("residential mortgage and foreclosure-related services.") MERS and MERSCORP.**
> **a. have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members and**

COMPLAINT - 5

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

      **b. have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respects to administration and delivery of services to Examined Members"**

    **(5.)** **By reason of the conduct set forth above, MERS and MERSCORP engaged in unsafe and unsound practices that expose them and Examined Members to unacceptable operation, compliance, legal and reputational risks."**

*In the Matter of MERSCORP, Inc.,* OCC No. AA-EC-11-20, 5 (2011) *Emphasis Added, See* Exhibit G.

43. Note that the consent to these findings was expressly signed by numerous MERS and MERSCORP personnel. See the enclosed Request for Judicial Notice.

44. The Washington State Supreme Court is currently considering a "MERS" case and therefore-at the least-the court is asked to halt the foreclosure in this case if and until a decision is issued by the Supreme Court on the legitimacy of MERS acting as a beneficiary.

45. The Court is also asked to take judicial notice of the case of *Bain v Metropolitan Mortgage Group Inc.,* Case No. C09-0149-JCC, W.D. Wash (2011.) in which the Federal Court certified the following questions to the Washington Supreme Court:

    **a. Is MERS a lawful "beneficiary" within the terms of Washington's Deed of Trust Act, RCW 61.24.005(2), if it never held the promissory note secured by the deed of trust?**

    **b. If so, what is the legal effect of MERS acting as an unlawful beneficiary under the terms of Washington's Deed of Trust Act?**

    **c. Does a homeowner possess a cause of action under Washington's Consumer Protection Act against MERS if MERS acts as an unlawful beneficiary under the terms of Washington's Deed of Trust Act?**

*Bain v Metropolitan Mortgage Group, Inc.,* "Order Certifying Question to the Washington Supreme Court" C09-0149-JCC, W.D. Wash (June 24, 2011.) *See* Exhibit H.

    **a. The Lender is the Beneficiary Under Washington Law, not MERS**

46. Note that the Deed of Trust conveys a security interest and power of sale in the real estate

**COMPLAINT - 6**

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

to the Lender, Windcremere (not MERS):

> This Security Instrument secures to Lender: (i) the repayment of the
> Loan, and all renewals, extensions and modifications of the Note; and
> (ii) the performance of Borrower's covenants and agreements under
> this Security Instrument and the Note. For this purpose, Borrower
> irrevocably grants, conveys to Trustee, in trust, with power of sale,
> the following described property located in the County of
> [Snohomish]: [legal description of property]. (*See* Exhibit B, at
> "Transfer of Rights in the Property," p.3).

47.  MERS is not a true beneficiary under Washington law becaue it does not posses the
     promissory note and secures no obligations as required of a beneficiary under
     Washington law. RCW 61.24.050(2). It is the lender who has secured the beneficial
     interest, as stated in the two Notes. MERS' actions in making assigments as a nominal
     beneficiary is not legal under Washington law. Any assignments made by MERS are
     invalid, including the two they made in this case.

48.  MERS itself admits it is not the beneficiary to any trust deed: in a September 2009
     deposition, MERS President R.K. Arnold admitted that his company does not have a
     beneficial interest in any mortgage; that it does not loan money; and that it does not suffer
     a default if a borrower fails to repay a mortgage loan.[1]

49.  As described above, given the language of the Deed of Trust, MERS is not the
     beneficiary to plaintiffs' mortgage (or any mortgage, for that matter).[2]

50.  Despite the fact MERS is not a beneficiary, they claimed to have such an interest in the
     plaintiffs' two properties on the Assigment Deed of Trust documents, in which they
     unilaterally assigned beneficial interest to Nationstar and then Flagstar, *See* Exhibits C
     and D.

---

[1] *See* Video Deposition of R.K. Arnold, *Henderson v. MERSCORP, Inc.*, Civil Action No. CV-08-900805 (Ala. Cir. Sept. 25 2009) available at http://www.stopforeclosurefraud.com/2010/05/29/full-deposition-of-mortgage-electronic-registration-systems-mers-president-ceo-r-k-arnold-merscorp/).

[2] *Mortgage Elec. Registration Sys., Inc. v. S.W. Homes of Ark.*, 301 S.W.3d 1, 4-5 (2009) ("MERS is not the beneficiary, even though it is so designated in the deed of trust. Pulaski Mortgage, as the lender on the deed of trust, was the beneficiary. It receives the payments on the debt"); *Mortgage Elec. Registration Sys., Inc. v. Neb. Dep't of Banking & Fin.*, 704 N.W.2d 784, 788 (Neb. 2005) (MERS does not acquire mortgage loans" because "simply stated, MERS has no independent right to collect on any debt because MERS itself has not extended credit, and none of the mortgage debtors owe MERS any money"); *In re Walker*, Case No. 10-21656-E-11 (Bankr.E.D.Cal.2010) (unpublished opinion) (Since MERS did not own the underlying note. it could not transfer the beneficial interest of the Deed of Trust to another. Any attempt to transfer the beneficial interest of a trust deed without ownership of the underlying note is void . . . .").

**COMPLAINT - 7**

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

51. In both of these Assignments, MERS calimed to assign "for value received," when in fact, MERS never lended any money and never gained any legitimate beneficial interest in the property. *See Id.*

52. The Note states that the borrowers are indebted to Simply Mortgage, Inc., and that Simply Mortgage, Inc. "may transfer the Note." Nowhere does it state that MERS is a beneficiary or is able to make unilateral assignments such as the Assignment Deed of Trust.

53. The Note and Deed of Trust are never meant to be separted.

54. Assignment 1 was executed by Robert R. Stoudemire, "Vice President" of MERS. Assignment 2 was executed by Matthew Barrett. *See* Exhibits C and D.

55. Plaintiffs' informational belief is that neither Stoudemire nor Barrett are MERS employees, and they are in fact employees of the bank that was recieving the assignment, effectiely creating a situation where a bank has assigned itself a loan with no papertrail showing what happened to to the previous lender.

56. Plaintiffs' informational belief is that Stoudemire was an employee of Flagstar and Barrett was an employee of Nationstar.

57. A proper, legal Assignment would have come from the previous beneficiary, showcasing that a legitimate change in the Holder of the Note had occurred.

58. As a result of the numerous violations of Washington's Deed of Trust Act, Plaintiff seeks monetary damages in an amount to be proven at time of trial.

## V. SECOND CAUSE OF ACTION, AGAINST ALL DEFENDANTS: Consumer Protection Violations

59. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs in the complaint as if fully set forth herein.

60. RCW 61.24.127 (1)(b) allows the plaintiffs to bring a claim for a violation of Washington's Consumer Protection Act, RCW 19.86.

61. The required elements of a Consumer Protection Act claim are as follows: (1) an unfair or deceptive act or practice; (2) that occurs in trade or commerce (3) an impact on the public interest; (4) injury to the plaintiff in his or her business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered. *Hangman Ridge*

COMPLAINT - 8

TRIAD LAW GROUP
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

*Training Stables, Inc. v. Safeco Title Ins. Co.* 105 Wn.2d 778, 784- 85, 719 P.2d 533 (1986)

62. The actions of defendants are deceptive, as plaintiffs' property was foreclosed by a beneficiary acting on an illegal Assignment Deed of Trust, that never should have existed because of previous defects in the chain of title. Fannie Mae's interest was null and void because MERS had no valid recorded interest in plaintiffs' Deed of Trust when it assigned the property to the two previous beneficiaries, Flagstar and Nationstar. Those Assignments taint the chain of title in such a way that the foreclosure should not have occurred.

63. Defendants' actions occur in the housing and mortgage markets, which are elements of trade and commerce.

64. Defendants' actions have a profound impact on members of the public. As a corporation that makes fraudulent assignments of loans across the country whose practices have come under question from many states and governing bodies, MERS and the other defendants who have taken action without making the proper recordings present a risk to borrowers in Washington state (as well as across the country.)

65. There is a causal link between the conduct engaged by the defendants and the injury to the plaintiffs, as the defendants' actions have caused the plaintiffs to face threats of eviction and destruction of their credit.

66. Having satisfied all elements of a consumer protection claim, Plaintiffs have established a violation of such and seeks damages in an amount to be proven at trial.

## VI. THIRD CAUSE OF ACTION AGAINST FLAGSTAR: Breach of Contract

67. The Plaintiff's re-allege the foregoing allegations and incorporate each allegation as if fully set forth herein.

68. In exchange for valuable consideration, Flagstar entered into a loan modification trial payment plan with the plaintiffs.

69. Flagstar promised the plaintiffs that if they made three trial payments of approximately $3500, the plaintiffs would receive a loan modification.

70. The plaintiffs made the three payments, but rather than receive the loan modification as promised, Flagstar demanded that they make another $3500 payment, which plaintiffs did.

COMPLAINT - 9

TRIAD LAW GROUP
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

Following this, Flagstar informed the plaintiffs that they had sold their loan to Nationstar, and that the plaintiffs would need to apply with Nationstar to receive a loan modification.

71. Flagstar's actions clearly constitute a material breach of the contract they made with the plaintiffs.

72. As a consequence of this breach of contract, Plaintiffs never received the loan mod they were due, and have suffered the loss of their home and considerable financial damages in an amount to be proven at trial.

## VII. FOURTH CAUSE OF ACTION AGAINST NATIONSTAR: Breach of the Covenant of Good Faith in Bargaining

73. The Plaintiff's re-allege the foregoing allegations and incorporate each allegation as if fully set forth herein.

74. The defendants must deal with the plaintiffs in good faith. "[A]n implied covenant of good faith adheres in every contract. The duty of good faith requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Edmondson v Popchoi*, 172 Wn.2d 272, 280 (2011), (*citing* Restatement (Second) of Contracts § 205 cmt. (a) (1981)).

75. Nationstar breach the covenant of good faith in bargaining with their loan modification offer.

76. After months of being told to wait and endless requests for paperwork, Nationstar offered a loan modification with payments in the amount of $5700, nearly $2600 more than their original payment amount of $3104.61.

77. Nationstar also sought to add $65,000 to the principle of the loan, which was $409,000 at the time. At this point, plaintiffs know that the home was worth at or about $300,000.

78. Giving the plaintiffs such an offer, when their only alternative was a foreclosure was clearly done in bad faith. As a result, the plaintiffs have lost their home, now face a bankruptcy and have suffered economic damages in an amount to be proven at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. A ruling that only the record beneficiary of a Deed of Trust has the authority to assign a Deed of Trust.

2. A ruling that MERS was never the beneficiary of Plaintiff's Trust Deed.

COMPLAINT - 10

TRIAD LAW GROUP
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

3.    A ruling that the record ownership of any beneficial interest in a deed of trust may only be held by one party.

4.    A ruling that the Assignment of Deed of Trust is void when it was executed and recorded by MERS. a non-beneficiary.

5.    A ruling awarding monetary damages to the plaintiffs as a result of the wrongful foreclosure.

6.    A ruling that the Consumer Protection Act was violated with damages to be proven at trial and an award of fees and costs under the CPA.

7.    A ruling that Flagstar breach their contract with the plaintiffs, with resulting damages thereform.

8.    A ruling that Nationstar breached the covenant of good faith in bargaining, with resulting damages therefrom.

9.    In the event the court is inclined to rule against the plaintiffs, an order staying this matter until the Washington State Supreme Court has ruled on the "MERS issue."

10.   Any such other relief as the Court deems just.

DATED this 14 day of August, 2012.

TRIAD LAW GROUP

Wesley Foreman, WSBA 44269
Attorney for Plaintiffs
Triad Law Group
209 Dayton Street, Suite 105
Edmonds, WA 98020
Tel: 425-774-0138
Fax: 425-672-7867
Email: Wesley.Foreman@triadlawgroup.com

COMPLAINT - 11

**FILED**

2012 AUG 21  AM 9: 28

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH.



**CL15775798**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SNOHOMISH

| | |
|---|---|
| Jonelle McCrorey; Jeff McCrorey and Danelle McCrorey, Husband and Wife,<br><br>Plaintiffs,<br><br>vs.<br><br>Federal National Mortgage Association; Nationstar Mortgage; Flagstar Bank, F.S.B.; Mortgage Electronic Registration Systems, Inc.,<br><br>Defendants. | NO. **12  2  07402  8**<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE** |

**TO THE COURT, THE PARTIES, AND THEIR ATTORNEY OF RECORD.**

Pursuant to the Washington Rules of Evidence 201, plaintiff submits the following Request for Judicial Notice in support of their amended complaint. The following documents are proper for judicial notice as they are publicly recorded documents central to the causes of action contained in the plaintiffs' amended complaint:

1.  Attached as Exhibit A is a true and correct copy of the Promissory Note signed by the plaintiffs.

2.  Attached as Exhibit B is a true and correct copy of the Deed of Trust signed by the plaintiffs.

3.  Attached as Exhibit C is a true and correct copy of the first Assignment Deed of Trust.

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE - 1**

**TRIAD LAW GROUP**
209 Dayton Street, Suite 105
Edmonds, WA 98020
Telephone: (425) 774-0138
Fax: (425) 672-7867

4. Attached as Exhibit D is a true and correct copy of the second Assignment Deed of Trust.

5. Attached as Exhibit E is a true and correct copy the Appointment of Successor Trustee.

6. Attached as Exhibit F is a true and correct copy of the third Assignment Deed of Trust.

7. Attached as Exhibit G is a true and correct copy of the Consent Order executed by MERS and a true and correct copy of the Stipulation and Consent to the Issuance of a Consent Order.

8. Attached as Exhibit H is a true and correct copy of an "Order certifying question to the Washington Supreme Court" in the case *Bain v Metropolitan Mortgage Group, Inc.*

DATED this __14__ day of August 2012.

**TRIAD LAW GROUP**

Wesley Foreman, WSBA 44269
Attorney for Plaintiffs
Triad Law Group
209 Dayton Street, Suite 105
Edmonds, WA 98020
Tel: 425-774-0138
Fax: 425-672-7867
Email: Wesley.foreman@triadlawgroup.com

**PLAINTIFF'S REQUEST FOR JUDICIAL
NOTICE - 2**

# EXHIBIT A, NOTE

V1 WBCD LOAN # 501667535
MIN: 100052550166753565

# NOTE

SEPTEMBER 27, 2007                    Snohomish,                                    WASHINGTON
[Date]                                           [City]                                          [State]

· 1820 CRESWELL RD, SNOHOMISH, WA 98290-7605
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.   $613,250.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  SIMPLY MORTGAGE, INC, A WASHINGTON CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  8.250%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   1ST   day of each month beginning on  NOVEMBER 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   OCTOBER 1, 2037,   I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
5715 WOLLOCHET DR NW
200
GIG HARBOR, WA  98335
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S.   $3,104.61.

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
© 1999-2007 Online Documents, Inc.                    Page 1  of 3                    F3200NOT  0701
                                                                                      09-27-2007  14:35

V1 NBCD LOAN # 501667535

sums already collected from me which exceed permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I we under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full mount of any monthly payment by the end of       15       calendar days after the date it is due, I will pay a late charg s to the Note Holder. The amount of the charge will be       5.000%  of my overdue payment of principal and interest. will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each mont ly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send ne a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amour . That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the N te Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and  Expenses**
If the Note Holder has required me to pay im mediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and exp nses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reas nable attorneys' fees.

**7.   GIVING OF NOTICES**

Unless applicable law requires a different me hod, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail o me at the Property Address above or at a different address if I give the Note Holder a notice of my different addres:

Any notice that must be given to the Note Ho der under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stat d in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.   WAIVERS**

I and any other person who has obligations u der this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the No e Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limite variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, eed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrum ent describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any in erest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Bon ower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if su :h exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender sh II give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the da e the notice is given in accordance with Section 15 within which

Initials: _____

V1 WBCD LOAN # 501667535

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JEFF MCCROREY

_____ (Seal)
JONELLE MCCROREY

_____ (Seal)
DANELLE MCCROREY

PAY TO THE ORDER OF
FLAGSTAR BANK, FSB
WITHOUT RECOURSE

SIMPLY MORTGAGE, INC

BY:_____

PRINTED NAME:_____

ITS:_____

[Sign Original Only]

# EXHIBIT B, DEED OF TRUST



2007120510545   13 PGS
10/01/2007 3:57pm $53.00
SNOHOMISH COUNTY, WASHINGTON

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-530-3

Assessor's Parcel or Account Number  290624-004-006-00

Abbreviated Legal Description  LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART
HEREOF  PTN SE1/4 31 2906
[Include lot, block and plat or section, township and range]
Full legal description located on page:      11

Escrow No. L 5231160 -3
V1 WBCD LOAN # 501667535
_____ [Space Above This Line For Recording Data] _____

INSURED BY        DEED OF TRUST          13) 35
CHICAGO TITLE     CHICAGO        MIN 100052550166753565

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21  Certain rules regarding the usage of words used in this document
are also provided in Section 16
(A) "Security Instrument" means this document, which is dated SEPTEMBER 27, 2007,
together with all Riders to this document
(B) "Borrower" is JEFF MCCROREY & DANELLE MCCROREY, husband and wife, and
JONELLE MCCROREY, an unmarried woman, in undivided interest.

Borrower is the trustor under this Security Instrument
(C) "Lender" is SIMPLY MORTGAGE, INC.

Trustee Joan H Anderson

Lender is a CORPORATION,                  organized and existing under the
laws of WASHINGTON.                              Lender's address is
5715 WOLLOCHET DR NW, 200, GIG HARBOR, WA 98335.

Initials:

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3048 1/01
© 1999-2004 Online Documents, Inc.        Page 1 of 11                 WAEDEED  0402
                                                              09-27-2007 14:35

V1 WBCD LOAN # 501667535

(D) "Trustee" is JOAN H. ANDERSON, EVP ON BEHALF OF FLAGSTAR BANK, FSB.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated SEPTEMBER 27, 2007.
The Note states that Borrower owes Lender ********FOUR HUNDRED THIRTEEN THOUSAND TWO HUNDRED FIFTY AND NO/100**************************************************
Dollars (U.S. $413,250.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 1, 2037.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider
☐ Balloon Rider  ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider  ☐ Biweekly Payment Rider
☐ V.A. Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation, or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3048 1/01
© 1999-2004 Online Documents, Inc.    Page 2 of 11    Initials: _____    WAEDEED 0402

09-27-2007 14:35



V1 WBCD LOAN # 501667535

this Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY
[Type of Recording Jurisdiction] of SNOHOMISH                          [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF
APN #: 290624-006-006-00

which currently has the address of 1920 CRESWELL RD, SNOHOMISH,
                                                               [Street] [City]
Washington   98290-7605   ("Property Address")
             [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

Initials:

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3048 1/01
© 1999-2004 Online Documents, Inc.   Page 3 of 11   WAEDEED   0402
09-27-2007   14:35

V1 WBCD LOAN # 501667535

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property, (b) leasehold payments or ground rents on the Property, if any, (c) premiums for any and all insurance required by Lender under Section 5, and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner

Initials: [handwritten] JM

V1 WBCD LOAN # 501667535

acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

Initials: _____

© 1999-2004 Online Documents, Inc.                  Page 5 of 11                       WAEDEED  0402

09-27-2007  14:15

V1 WBCD LOAN # 501667535

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property, Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court, and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3048 1/01

© 1999-2004 Online Documents, Inc.   Page 6 of 11   Initials: _____

WAEDEED_0402

09-27-2007  14:35

V1 WBCD LOAN # 501667535

requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums

Initials: ____

V1 WBCD LOAN # 501667535

secured by this Security Instrument, whether or not then due "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.

Initials: ___

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3048 1/01
© 1999-2004 Online Documents, Inc.
Page 8 of 11

WAEDEED 0402
09-27-2007 14:35

V1 WBCD LOAN # 501667535

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements, (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides

Initials: _____

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3048 1/01
© 1999-2004 Online Documents, Inc.                Page 9 of 11                    WAEDEED  0402
                                                                          09-27-2007  14:35

V1 WBCD LOAN # 501667535

a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3048 1/01
© 1999-2004 Online Documents, Inc.                Page 10 of 11                        WAEDEED  0402

Initials: _____

09-27-2007  14:35

V1 WBCD LOAN # 501667535

evidencing debt secured by this Security Instrument to Trustee Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law

25. Use of Property. The Property is not used principally for agricultural purposes

26. Attorneys' Fees. Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it



_____ (Seal)
JEFF MCCROREY

_____ (Seal)
JONELLE MCCROREY

_____ (Seal)
DANELLE MCCROREY

State of WASHINGTON                                     County of SNOHOMISH SS:

On this day personally appeared before me Jeff McCrorey and Danelle McCrorey

to me known to be the individuals who are described in and who executed the within and foregoing instrument, and acknowledged that they signed the same as their free and voluntary act and deed, for the uses and purposes therein mentioned.

GIVEN under my hand and official seal this 27th day of September, 2007.

Kerstin C. Thompson
Notary Public in and for the State of Washington, residing at

My Appointment Expires on: 11-9-10

WASHINGTON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3048 1/01
© 1999-2004 Online Documents, Inc.          Page 11 of 11          WAEDEED .0402

09-27-2007 14:35

STATE OF WASHINGTON, COUNTY OF SNOHOMISH  ss

ON THIS ___27th___ DAY OF SEPTEMBER , 2007 , BEFORE ME PERSONALLY
APPEARED  JEFF MCCROREY TO ME  KNOWN TO BE THE INDIVIDUAL WHO EXECUTED
THE FOREGOING INSTRUMENT AS ATTORNEY IN FOR JONELLE MCCROREY AND
ACKNOWLEDGED THAT HE SIGNED THE SAME AS HIS FREE AND VOLUNTARY ACT AND
DEED AS ATTORNEY IN FACT FOR SAID PRINCIPAL FOR THE USES AND PURPOSES
HEREIN MENTIONED, AND ON OATH STATED THAT THE POWER OF ATTORNEY
AUTHORIZING THE EXECUTION OF THIS INSTRUMENT HAS NOT BEEN REVOKED AND
THAT SAID PRINCIPAL IS NOW LIVING AND IS NOT INSANE
     GIVEN UNDER MY HAND AND OFFICIAL SEAL THE DAY AND YEAR LAST ABOVE
WRITTEN

NOTARY SIGNATURE:

PRINTED NAME  Kerstin C Thompson
NOTARY PUBLIC IN AND FOR THE STATE OF WASHINGTON
RESIDING AT  Everett          MY COMMISSION EXPIRES  11-9-10

Unofficial Document

NOTARY/BDA(05/03)

CHICAGO TITLE INSURANCE COMPANY

Order No  005231160

LEGAL DESCRIPTION

THAT PORTION OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION
24, TOWNSHIP 29 NORTH, RANGE 6 EAST, W M , DESCRIBED AS FOLLOWS

BEGINNING AT THE INTERSECTION OF THE SOUTH LINE OF THE O K  MILL COUNTY
ROAD AND THE WEST LINE OF THE COOMS MILL REVISION COUNTY ROAD,
THENCE SOUTH ALONG THE WEST LINE OF SAID COOMS MILL REVISION ROAD FOR 256
FEET TO THE TRUE POINT OF BEGINNING,
THENCE WEST FOR 250 FEET, MORE OR LESS, TO THE WEST LINE OF SAID
SUBDIVISION;
THENCE SOUTH ALONG SAID WEST LINE TO THE SOUTHWEST CORNER OF SAID
SUBDIVISION;
THENCE EAST ALONG THE SOUTH LINE THEREOF TO THE WEST LINE OF SAID COOMS
MILL REVISION ROAD,
THENCE NORTHERLY ALONG SAID WEST LINE TO THE TRUE POINT OF BEGINNING;

SITUATE IN THE COUNTY OF SNOHOMISH, STATE OF WASHINGTON

LEGAL1/RDA/0998

Unofficial Document

# EXHIBIT C, ASSIGNMENT 1



200901230709
01/23/2009 3:43pm $14.00
SNOHOMISH COUNTY, WASHINGTON

After Recording Return to:
Northwest Trustee Services, Inc.
Attention: Becky Baker
P.O. Box 997
Bellevue, WA 98009-0997

7081.21421/McCrorey, Jeff, Jonelle and Danelle

### Assignment of Deed of Trust

For Value Received, the undersigned as Beneficiary, hereby grants, conveys, assigns and transfers to Flagstar Bank, FSB, whose address is 5151 Corporate Drive Troy, MI 48098, all beneficial interest under that certain deed of trust, dated 09/27/07, executed by Jeff McCrorey and Danelle McCrorey, husband and wife and Jonelle McCrorey, an unmarried woman, in undivided interest, Grantors, to Joan H. Anderson, EVP on behalf of Flagstar Bank, FSB, Trustee, and recorded on 10/01/07, under Auditor's File No. 200710010646, Records of Snohomish County, Washington, describing land therein as:

That portion of the Southeast Quarter of the Southeast Quarter of Section 24, Township 29 North, Range 6 East, WM, described as follows: Beginning at the intersection of the South line of the O.K. Mill County Road and the West line of the Coous Mill Revision County Road; thence South along the West line of said Coous Mill Revision Road for 256 feet to the true point of beginning; thence West for 250 feet, more or less, to the West line of said Subdivision; thence South along said West line to the Southwest corner of said subdivision; thence East along the South line thereof to the West line of said Coous Mill Revision Road; thence Northerly along said West line to the true point of beginning; situate in the County of Snohomish, State of Washington

Tax Account No.

Together with note or notes therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated ___Jan 26___, 20 09

FIRST AMERICAN 3985494
1/6

Mortgage Electronic Registration Systems, Inc.

By
Typed Name: Robert R. Stoudemire
Title: Vice President

State of Michigan  )
                   ) ss.
County of Oakland  )

I certify that I know or have satisfactory evidence that Robert R. Stoudemire is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Vice President of Mortgage Electronic Registration Systems, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: ___1-26-09___

NOTARY PUBLIC in and for the State of MI

Residing at ___Wayne County___
My commission expires ___10-17-11___

Dartha Lewis
NOTARY PUBLIC, WAYNE COUNTY, MI
My Commission Expires October 17, 2011
Acting in Oakland County, MI

# EXHIBIT D, ASSIGNMENT 2

ELECTRONICALLY RECORDED
201009030741                    2
09/03/2010 11:28 AM           15.00
SNOHOMISH COUNTY, WASHINGTON

When recorded mail to:

Nationstar Mortgage LLC
350 Highland Drive
Lewisville, TX 75067

TS #: WA-10-377388-SH                    Space above this line for recorders use
Order #: 4506873
APN #: 290624-004-006-00
Loan #: 0596565760

## Assignment of Deed of Trust

For value received, the undersigned* corporation hereby grants, assigns, and transfers to

**NationStar Mortgage**

All beneficial interest under that certain Deed of Trust dated 9/27/2007 executed by **JEFF MCCROREY AND DANELLE MCCROREY, HUSBAND AND WIFE, AND JONELLE MCCROREY, AN UNMARRIED WOMAN, IN UNDIVIDED INTEREST,** as Trustor(s) to **JOAN H. ANDERSON, EVP ON BEHALF OF FLAGSTAR BANK, FSB.,** as Trustee and recorded as Instrument No. 200710010646, on 10/1/2007, in Book xxx, Page xxx of Official Records, in the office of the County Recorder of SNOHOMISH County, WA together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

*★ Mortgage Electronic Registration Systems Inc. as nominee for Simply Mortgage, Inc. Its successors & Assigns.*

TS #: WA-10-377388-SH
Page 2

Dated: _Aug 24, 2010_

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., ("MERS"), AS NOMINEE FOR
SIMPLY MORTGAGE, INC. IT'S SUCCESSORS
AND ASSIGNS

By: _Matthew Ballett_

State of: _Texas_ )
) ss
County of: _Denton_ )

On _8/24/10_ before me, _Toniqua Green_ _____ the undersigned Notary
Public, personally appeared _Matthew Ballett_ _____ (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal

Signature _____ (Seal)

TONIQUA L. GREEN
Notary Public, State of Texas
My Commission Expires
January 28, 2014

# EXHIBIT E,
# APPOINTMENT OF
# SUCCESSOR TRUSTEE

ELECTRONICALLY RECORDED
201009220263                               2
09/22/2010 11:49 AM                    15.00
SNOHOMISH COUNTY, WASHINGTON

When recorded return to:

Quality Loan Service Corp. of Washington
2141 5th Avenue
San Diego, CA 92101

TS #: WA-10-377388-SH
Order #: 4506873
APN: 290624-004-006-00

Space above this line for recorders use only

# Appointment of Successor Trustee

NOTICE IS HEREBY GIVEN that **QUALITY LOAN SERVICE CORPORATION OF WASHINGTON**, a corporation formed under RCW 61.24, whose address is 2141 5th Avenue   San Diego, CA 92101 is hereby appointed Successor Trustee under that certain Deed of Trust dated 9/27/2007, executed by **JEFF MCCROREY AND DANELLE MCCROREY, HUSBAND AND WIFE, AND JONELLE MCCROREY, AN UNMARRIED WOMAN, IN UNDIVIDED INTEREST.** as Grantor, in which JOAN H. ANDERSON, EVP ON BEHALF OF FLAGSTAR BANK, FSB. was named as Trustee, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("MERS"), AS NOMINEE FOR SIMPLY MORTGAGE, INC.** as Beneficiary, and recorded on 10/1/2007, under Auditor's File No. 200710010646 as book xxx, page xxx, , Official Records:    Said real property is situated in **SNOHOMISH** County, Washington and is more particularly described in said Deed Of Trust.

IN WITNESS WHEREOF, the Beneficiary, NationStar Mortgage, has hereunto set his hand; if the undersigned* is a corporation, it has caused its corporate name to be signed and affixed hereunto by its duly authorized officers.

Page 1

TS #: WA-10-377388-SH
Page 2

Dated: 9-14-10

Nationstar Mortgage LLC, by Quality Loan Service
Corporation of Washington as its attorney in fact

By: Rodney McCumsey, Assistant Secretary

State of California )
                    ) ss
County of San Diego )

On 9/14/10 before me, Brenda Susana Perez the undersigned Notary Public, personally appeared Rodney McCumsey who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature _____ (Seal)
Brenda Susana Perez

BRENDA SUSANA PEREZ
Commission # 1693771
Notary Public - California
San Diego County
My Comm. Expires Sep 15, 2010

Page 1

# EXHIBIT F, ASSIGNMENT 3

When recorded mail to.

Nationstar Mortgage LLC
380 Highland Drive
Lewisville, TX 75067

201106240250      2    PGS
06/24/2011 11:08am $15.00
SNOHOMISH COUNTY, WASHINGTON

TS #: WA-10-377388-SH
Order #: 4506873
APN #:

Space above this line for recorders use

1ST AM @/15

## Assignment of Deed of Trust

For value received, the undersigned* corporation hereby grants, assigns, and transfers to

Federal National Mortgage Association

All beneficial interest under that certain Deed of Trust dated **9/27/2007** executed by **JEFF MCCROREY AND DANELLE MCCROREY, HUSBAND AND WIFE, AND JONELLE MCCROREY, AN UNMARRIED WOMAN, IN UNDIVIDED INTEREST**, as Trustor(s) to **JOAN H. ANDERSON, EVP ON BEHALF OF FLAGSTAR BANK, FSB.**, as Trustee and recorded as Instrument No. **200710010646**, on **10/1/2007**, in Book xxx, Page xxx of Official Records, in the office of the County Recorder of **SNOHOMISH** County, WA together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

\* Nationstar Mortgage LLC, by Quality Loan Service Corporation of Washington as its attorney in fact

T6 #: WA-10-377388-SH
Page 2

Dated: 9-14-10

Nationstar Mortgage LLC, by Quality Loan Service
Corporation of Washington as its attorney in fact

By: Rodney McCumsey, Assistant Secretary

State of California )
) ss
County of San Diego )

On 9/14/10 before me, **Brenda Susana Perez** the undersigned Notary Public, personally appeared **Rodney McCumsey** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
Brenda Susana Perez

BRENDA SUSANA PEREZ
Commission # 1693771
Notary Public - California
San Diego County
My Comm. Expires Sep 15, 2010

# EXHIBIT G, MERS ORDER

**#2011-044**

### UNITED STATES OF AMERICA
### DEPARTMENT OF THE TREASURY
### COMPTROLLER OF THE CURRENCY
### WASHINGTON, D.C.

### BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
### WASHINGTON, D.C.

### FEDERAL DEPOSIT INSURANCE CORPORATION
### WASINGTON, D.C.

### OFFICE OF THRIFT SUPERVISION
### WASHINGTON, D.C.

### FEDERAL HOUSING FINANCE AGENCY
### WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of: ) | OCC No. AA-EC-11-20 |
| ) | |
| MERSCORP, Inc., and the ) | Board of Governors |
| Mortgage Electronic Registration Systems, Inc., ) | Docket Nos. 11-051-B-SC-1, |
| Reston, Virginia ) | 11-051-B-SC-2 |
| ) | |
| ) | FDIC-11-194b |
| ) | |
| ) | OTS No. 11-040 |
| ) | |
| ) | FHFA No. EAP-11-01 |

### CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), the Board of Governors of the Federal Reserve System, Washington, D.C.

("Board of Governors"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of

Thrift Supervision ("OTS"), and the Federal Housing Finance Agency ("FHFA") (collectively

the "Agencies"), as part of an interagency horizontal review of major residential mortgage servicers and mortgage service providers, have conducted an examination of MERSCORP, Inc. ("MERSCORP"), and of its wholly-owned subsidiary corporation, Mortgage Electronic Registration Systems, Inc., ("MERS"), both of which provide various services to financial institutions related to tracking and registering residential mortgage ownership and servicing, acting as mortgagee of record in the capacity of nominee for lenders, and initiating foreclosure actions.  The Agencies have identified certain deficiencies and unsafe or unsound practices by MERS and MERSCORP that present financial, operational, compliance, legal and reputational risks to MERSCORP and MERS, and to the participating Members.  Members are institutions that use MERSCORP's and MERS' services and have agreed to abide by MERSCORP's Rules of Membership (the "Rules").  The Members include depository institutions regularly examined by, or subsidiaries or affiliates of depository institutions subject to examination by the OCC, the Board of Governors, the FDIC, the OTS, and other appropriate Federal banking agencies, as defined by subsection 1(b)(1) of the Bank Service Company Act, 12 U.S.C. § 1861(b)(1), and Fannie Mae and Freddie Mac, which are subject to examination by the FHFA, (collectively "Examined Members").  The Agencies have informed MERS and MERSCORP of the findings resulting from the examination.  MERS and MERSCORP have begun implementing procedures to remediate the practices addressed in this Order.

MERS and MERSCORP, by and through their duly elected and acting Boards of Directors (collectively the "Boards"), have executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 13, 2011 ("Stipulation and Consent"), that is accepted by the Agencies.  By this Stipulation and Consent, which is incorporated by reference, MERS and MERSCORP have consented to the issuance of this Consent Cease and Desist Order ("Order"),

pursuant to 12 U.S.C. §§ 1818(b), 1867(c)-(d), and 4631, by the Agencies, consistent with the Stipulation and Consent. MERS and MERSCORP have committed to take all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the Agencies.

## ARTICLE I

### JURISDICTION

For purposes of this Consent Order:

(1)    MERS and MERSCORP are providers of services to Examined Members within the meaning of 12 U.S.C. § 1867(c).

(2)    MERS and MERSCORP are each an "institution-affiliated party" within the meaning of 12 U.S.C. § 1813(u) by virtue of MERS acting as agent for lenders (who include Examined Members) with respect to serving as mortgagee in a nominee capacity for the lender, and are each an "entity-affiliated party" within the meaning of 12 U.S.C. § 4502(11) by virtue of MERS acting as agent for Fannie Mae and Freddie Mac with respect to serving as mortgagee in a nominee capacity for the owner of residential mortgage loans.

(3)    The OCC, the Board of Governors, the OTS, and the FDIC examined the services provided by MERS and MERSCORP to Examined Members pursuant to the provisions of 12 U.S.C. § 1867(c), on behalf of themselves and other appropriate Federal banking agencies as defined in 12 U.S.C. § 1861(b)(1).

(4)    The Agencies have authority to enter into this Consent Order pursuant to 12 U.S.C. §§ 1818(b), 1867(c)-(d), and 4631.

## ARTICLE II

### AGENCIES' FINDINGS

The Agencies find, and MERS and MERSCORP neither admit nor deny, the following:

(1)     MERS is a wholly-owned subsidiary of MERSCORP. MERSCORP's shareholders include federally regulated financial institutions that own and/or service residential mortgages, including Examined Members, and other primary and secondary mortgage industry participants.

(2)     MERSCORP operates a national electronic registry that tracks beneficial ownership interests and servicing rights associated with residential mortgage loans and any changes in those interests or rights. There are approximately 5,000 participating Members, of which 3,000 are residential mortgage servicers. Members register loans and report transfers, foreclosures, and other changes to the status of residential mortgage loans on the MERS System. There are currently approximately 31 million active residential mortgage loans registered on the MERS System. Examined Members receive a substantial portion of the services provided by MERSCORP and MERS.

(3)     MERS serves as mortgagee of record and nominee for the participating Members in local land records. MERS takes action as mortgagee through documents executed by "certifying officers" of MERS. MERS has designated these individuals, who are officers or employees of Members or certain third-parties who have contractual relationships with Members, as officers of MERS. By virtue of these designations, the certifying officers execute legal documents in the name of MERS, such as mortgage assignments and lien releases.

(4)      In connection with services provided to Examined Members related to tracking, and registering residential mortgage loans and initiating foreclosures ("residential mortgage and foreclosure-related services"), MERS and MERSCORP:

(a)      have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; and

(b)      have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members.

(5)      By reason of the conduct set forth above, MERS and MERSCORP engaged in unsafe or unsound practices that expose them and Examined Members to unacceptable operational, compliance, legal, and reputational risks.

Pursuant to the authority vested in them by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §§ 1818(b), the Bank Service Company Act, 12 U.S.C. § 1867(c)-(d), and the Federal Housing Enterprises Financial Safety and Soundness Act, 12 U.S.C. § 4631, the Agencies hereby ORDER that:

## ARTICLE III

### COMPLIANCE COMMITTEE

(1)      Within twenty (20) days of this Order, the Boards of Directors of MERSCORP and MERS (the "Boards") shall each establish and thereafter maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of MERS or MERSCORP or any of their subsidiaries or affiliates.  In the event of a change of the

membership, the name of any new committee member shall be submitted to the OCC Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller"). The Compliance Committee shall be responsible for monitoring and coordinating MERS' and MERSCORP's compliance with the terms and provisions of this Order. The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)    Within ninety (90) days of this Order, and within thirty (30) days of the end of each calendar quarter thereafter, the Compliance Committee shall submit a written progress report to the Boards setting forth in detail its actions taken to comply with each Article of this Consent Order, and the results and status of those actions.

(3)    The Boards shall forward a copy of the Compliance Committee's report, with any additional comments by the Boards, to the Deputy Comptroller and the OCC Examiner-in-Charge within ten (10) days of receiving such report.

## ARTICLE IV

## ACTION PLAN

(1)    Within ninety (90) days of this Order, MERS and MERSCORP shall jointly develop and submit to the Deputy Comptroller an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with the terms and provisions of this Order ("Action Plan"), as well as the resources to be devoted to the planned actions, with respect to services provided to Examined Members. In the event the Deputy Comptroller requests MERS or MERSCORP to revise the Action Plan, they shall immediately make the requested revisions and resubmit the Action Plan to the Deputy Comptroller. Following acceptance of the Action Plan by the Deputy Comptroller, MERS and

MERSCORP shall not take any action that would constitute a significant deviation from, or material change to the requirements of the Action Plan, or this Order, unless and until MERS or MERSCORP have received a prior written determination of no supervisory objection from the Deputy Comptroller.

(2)     The Boards shall ensure that MERS and MERSCORP achieve and thereafter maintain compliance with this Order, including, without limitation, successful implementation of the Action Plan.  The Boards shall further ensure that, upon implementation of the Action Plan, MERS and MERSCORP achieve and maintain effective residential mortgage and foreclosure-related services on behalf of Examined Members, as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions.  In order to comply with these requirements, the Boards shall:

(a)     require the timely reporting by MERS and MERSCORP management of such actions taken to comply with this Order and/or directed by either Board to be taken pursuant to this Order;

(b)     follow-up on any compliance issues with such actions in a timely and appropriate manner; and

(c)     require corrective action be taken in a timely manner for any non-compliance with such actions.

(3)     The Action Plan shall address, at a minimum:

(a)     the capability of the Boards and senior management to ensure that MERS and MERSCORP are operated in a safe and sound manner in accordance with applicable laws, regulations and requirements of this Order;

(b)     development and implementation of a strategic plan to include a comprehensive review of business operations, including the risks associated with each business line, and recommendations to implement the strategic plan;

(c)     consistent with the strategic plan, development and implementation of a financial plan to ensure that MERSCORP and MERS have adequate financial strength to support business operations related to Examined Members.  The financial plan, at a minimum, shall address:

(i)     any need for additional capital, including the amount and source of capital;

(ii)    the identification, measurement, monitoring and control of funding and liquidity risk; and

(iii)   a profit and budget plan to include specific goals to reduce discretionary expenses and improve and sustain earnings, as well as maintain adequate reserves for contingency risks and liabilities;

(d)     development and implementation of a comprehensive litigation strategy to effectively manage lawsuits and legal challenges involving MERS and MERSCORP, regardless of whether MERSCORP or MERS is a named party, including early identification and tracking of such lawsuits and challenges;

(e)     development and implementation of a communication plan to communicate effectively and in a timely manner with MERSCORP's shareholders, Members including Examined Members, and relevant external parties;

(f)     development and implementation of a compliance and quality assurance program for ensuring that Examined Members implement and follow all of the Rules, including

adherence to the requirements set forth in MERS Announcement 2011-01, dated February 16, 2011;

(g)     development and implementation of a plan to ensure that MERS certifying officers are transitioned expeditiously onto the Corporate Resolution Management System ("CRMS") in accordance with MERS' current certifying officer policy and process;

(h)     development and implementation of appropriate standards to maintain separation of corporate functions between MERS and MERSCORP;

(i)     review of the effectiveness of the Rules, and related Procedures, Terms and Conditions to determine what, if any, additions, amendments, or deletions are appropriate;

(j)     development and implementation of enhanced information reporting practices to senior management from lower levels of each organization, and from senior management to the Boards to ensure that significant issues are properly identified and escalated, and that corporate actions are considered, taken in a timely fashion, ands properly documented;

(k)     any Matter Requiring Attention in the OCC Supervisory Letter No. MERS 2011-01, dated January 19, 2011, that addresses an issue that is not otherwise covered by provisions of this Order; and

(l)     development of contingency plans to address issues that arise with respect to any of the foregoing elements of the Action Plan, including plans that address operational continuity issues in the normal course of business and in a stressed environment.

(4)     The Action Plan shall specify timelines for completion of each of the requirements of this Order.  The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

## ARTICLE V

## BOARD AND MANAGEMENT SUPERVISION

(1)     Within thirty (30) days from the effective date of this Order, MERSCORP and MERS shall engage an independent third party, acceptable to the Deputy Comptroller, with the appropriate expertise and qualifications to analyze and assess the directors, officers, management and staffing needs with respect to any and all services provided by MERSCORP and MERS to Examined Members, in order to operate MERS and MERSCORP in a safe and sound manner and achieve compliance with this Order.  The engagement shall provide that the required analysis and assessment be completed and summarized in a written report to the Boards ("Management Report") within sixty (60) days of the third party's engagement, with a copy simultaneously delivered to the Deputy Comptroller.  At a minimum, the Management Report shall:

(a)     identify the type and number of positions needed appropriately to manage and supervise all services provided to Examined Members, including, but not limited to: (i) the orderly and expeditious transitioning of Examined Members onto the CRMS; (ii) the enhanced communication and coordination with Examined Members required by the Communications Plan; and (iii) registration or tracking systems, assignment and/or foreclosure services, detailing any vacancies and additional staffing needs with appropriate consideration to the scope and complexity of the services provided, for the number of Examined Members and MERS certifying officers who will need to complete the certification process, and for the size of the portfolios for which these services are provided;

(b)     identify the type and number of officer and staff positions needed to ensure compliance with all applicable federal and state laws and regulations and material

contractual requirements, as well as to implement any newly established or revised plans, policies, procedures, processes and systems required by this Order, detailing any vacancies, additional needs and/or unit re-alignments required with appropriate consideration to the scope and complexity of the services provided as well as the size of the portfolios for which these services are provided;

(c)    identify and address the appropriateness of the duties, responsibilities, authority and accountability of each professional position, giving due consideration to the relevant knowledge, skills, abilities, and experience of the incumbent (if any);

(d)    present a clear and concise description of the relevant knowledge, skills, abilities, and experience necessary for each officer position, including delegations of authority and performance objectives, including whether the incumbent (if any) has the requisite knowledge, skills, abilities, and experience for such position;

(e)    recommend a plan to recruit and retain directors, officers, management and staff consistent with the independent third party's analysis and assessment;

(f)    recommend any reorganization or realignment of directors, officers, management and staff consistent with the independent third party's analysis and assessment;

(g)    recommend any additional training and development needs as well as a plan to provide such training and development to appropriate directors, officers, management and staff; and

(h)    recommend procedures to periodically review and update the Management Plan required by subparagraph (3) below and assess the performance of all directors, officers, management and staff.

(2)     MERSCORP and MERS shall provide a copy of the proposed engagement letter or contract with the third party to the Deputy Comptroller for review and non-objection prior to entering into the engagement.

(3)     Within thirty (30) days of receipt of the Management Report, MERSCORP and MERS shall jointly develop a written plan of action (the "Management Plan") in response to each recommendation contained in the Management Report and a time frame for completing each action.  The Management Plan and any subsequent modification(s) thereto shall be submitted to the Deputy Comptroller for review and non-objection.

(4)     The Boards shall immediately establish a schedule of regular Board meetings to be held at least once every calendar quarter.


## ARTICLE VI

## COMMUNICATIONS RELATING TO LEGAL PROCEEDINGS

(1)     Within sixty (60) days of this Order, MERS and MERSCORP shall jointly develop and submit to the Deputy Comptroller a plan for communicating with Members concerning significant legal proceedings or issues.  The plan shall include:

(a)  a process for notifying and informing Examined Members concerning significant legal proceedings and legal issues that relate to the functioning of MERS, MERSCORP, or the Examined Members' interests with respect to MERS or MERSCORP, including, but not limited to significant favorable or adverse decisions, within a short time period after the issue arises or a decision is issued;

(b) a process that provides sufficient incentives for Members to inform MERSCORP and MERS of the filing of all lawsuits brought in MERS' name or to which MERS is a named party, and periodically update MERS concerning the status of such lawsuit;

(c) a process to track all legal proceedings brought in MERS' name, in which MERS is a named party, or which involve legal issues that affect the interests of MERS, MERSCORP, or Examined Members with respect to MERSCORP and MERS;

(d) a process to ensure an appropriate response by MERS to legal proceedings brought in MERS' name, in which MERS is a named party, or which involve legal issues that affect the interests of MERS, MERSCORP, or Examined Members with respect to MERSCORP and MERS;

(e) proposed revisions as necessary to the MERSCORP Rules to implement these processes.

(2)    Within thirty (30) days of this Order, MERSCORP and MERS shall establish Legal Risk Subcommittees of the Boards, which shall make regular reports to the Boards on outstanding legal issues and pending litigation that affect the interests of MERS, MERSCORP, and Examined Members with respect to MERSCORP and MERS, and provides analysis and recommendations concerning litigation contingency reserves.

## ARTICLE VII

## CERTIFYING OFFICERS

(1):    Within sixty (60) days of this Order, MERS shall prepare and submit a plan to the Deputy Comptroller to strengthen its governance processes applicable to MERS certifying officers with respect to Examined Members.  The plan shall include, but not be limited to:

(a) policies and processes to designate or certify individuals as authorized MERS certifying officers, and that only such individuals act in such capacity;

(b) policies, processes and resources to track the identity and activities of MERS certifying officers and to ensure their compliance with the Rules and related requirements, including the requirements of the CRMS;

(c) policies, processes and resources to register third-party MERS certifying officers who are acting for Examined Members;

(d) policies, processes and resources to ensure the adequacy and appropriateness of training for certifying officers;

(e) policies, processes, and resources to ensure that Examined Members comply with MERS Membership Rule 8 and MERS Announcement 2011-01; and

(f) policies, processes, and resources to ensure that Examined Members and third parties can quickly and accurately determine if specific individuals are designated to act as authorized MERS certifying officers.

## ARTICLE VIII

## QUALITY ASSURANCE AND DATA INTEGRITY

(1)    Within sixty (60) days of this Order, MERS and MERSCORP shall jointly prepare and submit a plan to the Deputy Comptroller to strengthen its policies, processes, resources and controls for data standards and quality assurance of information submitted to and contained in MERSCORP data systems.  The plan shall include, but not be limited to:

(a) an assessment and determination of which data elements are necessary to MERS and MERSCORP operations and should be mandatory reporting requirements

("mandatory reporting fields") for Examined Members. The plan shall include elimination of collection of existing data elements currently reported by Members that are not reasonably related to MERS or MERSCORP operations;

(b) policies, processes and resources to ensure the accuracy and reliability of data reported to MERSCORP, including but not limited to system-to-system reconciliations of all MERS mandatory reporting fields, frequent capture of all reject/warning reports associated with registrations, transfers, and status updates on open-item aging reports, and an accurate determination of foreclosures pending in MERS' name;

(c) adoption or revision of an adequate written quality assurance procedures manual and processes to ensure appropriate implementation of the quality assurance program described in the quality assurance procedures manual;

(d) policies, processes and resources to ensure that Examined Members comply with MERSCORP approved quality assurance plans submitted to MERSCORP by Examined Members and provide to MERSCORP an annual independent report demonstrating their adherence to their MERSCORP approved quality assurance program, including submission of all mandatory MERS data reporting fields, and processes for system-to-system reconciliation and reject/warning error correction.


## ARTICLE IX

## eREGISTRY

(1)     Within ninety (90) days from the effective date of this Order, the MERSCORP Board shall obtain an independent, external review of and recommendations regarding the eRegistry system of recording electronic notes. The review and recommendations shall consider

whether appropriate policies, procedures, and operating controls are in place to ensure effective operation of eRegistry.  Within sixty (60) days of completion of the review and recommendations required by this Article, MERSCORP shall submit to the Deputy Comptroller for review and supervisory non-objection a plan describing actions necessary to implement any changes to applicable policies, procedures and controls as a result of the findings of the audit.  In the event the Deputy Comptroller asks MERSCORP to revise the plan required by this Article, MERSCORP shall immediately make the requested revisions and resubmit the plan.

## ARTICLE X

## COMMUNICATIONS PLAN

(1)     Within sixty (60) days from the effective date of this Order, MERSCORP shall develop, adopt and implement a plan designed to enhance communications and coordination with its Examined Members with respect to their duties and responsibilities as set forth in the Rules and related Procedures, Terms and Conditions ("Communications Plan").  The Communication Plan shall, at a minimum, be designed to ensure that all Examined Members and appropriate personnel within an Examined Member are aware of, and can comply with current Rules and related Procedures, Terms and Conditions and any new or revised Rules or related Procedures, Terms and Conditions on an ongoing basis and to ensure that Examined Members and appropriate personnel within or retained by an Examined Member are aware of, and are able to comply with, the requirement to advise MERSCORP of the initiation of litigation naming or otherwise involving MERS, MERSCORP and/or one of their subsidiaries and coordinate the defense or prosecution of such litigation with MERSCORP.

## ARTICLE XI

## APPROVAL, IMPLEMENTATION AND REPORTS

(1)    MERS and MERSCORP shall submit the written assessments, reports and plans required by this Order for review and written determination of no supervisory objection to the Deputy Comptroller and within the applicable time periods set forth in the Order.  MERS and MERSCORP shall adopt the plans required by this Order upon receipt of a determination of no supervisory objection from the OCC, and shall immediately make any revisions requested by the Deputy Comptroller.  Upon adoption, MERS and MERSCORP shall immediately implement the plans required by this Order and thereafter fully comply with them.

(2)    During the term of this Order, the required plans, programs, policies and procedures shall not be amended or rescinded in any material respect without the prior written approval of the Deputy Comptroller.

(3)    During the term of this Order, MERS and MERSCORP shall revise the required plans, programs, policies and procedures as necessary to incorporate new or changes to applicable federal and state laws, rules, regulations, guidelines, court orders, and contractual or other requirements.

(4)    The Boards shall ensure that MERS and MERCORP have processes, personnel, resources, and control systems to ensure implementation of and adherence to the plans, programs, policies and procedures required by this Order.

(5)    Within thirty (30) days after the end of each calendar quarter following the date of this Order, MERS and MERSCORP shall submit to the Deputy Comptroller a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information

sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the Deputy Comptroller. The Deputy Comptroller may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

    (6)    All communication regarding this Order shall be sent to:

        (a)    Joseph H. Evers
              Deputy Comptroller for Large Bank Supervision
              Office of the Comptroller of the Currency
              250 E Street, SW
              Washington, DC 20219

With copy to:

        (b)    Stephen Jackson
              National Bank Examiner
              Office of the Comptroller of the Currency
              250 E Street, SW
              Washington, DC 20219

## ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

    (1)    If MERS or MERSCORP contend that compliance with any provision of this Order would not be feasible or legally permissible, or requires an extension of any timeframe within this Order, the Boards shall submit a written request to the Deputy Comptroller asking for relief. Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent either MERS or MERSCORP from complying with a provision, that require the Deputy Comptroller to exempt either of them from a provision, or that require an extension of a timeframe within this Order.

MERS Consent Order

(2)     All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which MERS or MERSCORP relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.

## ARTICLE XIII

## OTHER PROVISIONS

(1)     Although this Order requires MERS and MERSCORP to submit certain actions, reports and plans for the review or a written determination of no supervisory objection by the Deputy Comptroller, the Boards have the ultimate responsibility for proper and sound management of MERS and MERSCORP.

(2)     In each instance in this Order in which MERS or MERSCORP are required to ensure adherence to, and undertake to perform certain obligations, it is intended to mean that the Boards shall:

(a)  authorize and adopt such actions on behalf of MERS and MERSCORP as may be necessary for them to perform their obligations and undertakings under the terms of this Order;

(b)  require the timely reporting of MERS and MERSCORP management of such actions directed by either Board to be taken under the terms of this Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

(d)  require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3)     If, at any time, the Comptroller, the Board of Governors, the FDIC, the OTS, or the FHFA deems it appropriate in fulfilling the responsibilities placed upon them by the several laws of the United States to undertake any action affecting MERS or MERSCORP, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent either any of them from so doing.

(4)     This Order is and shall become effective upon its execution by the Agencies through their authorized representatives whose hands appear below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(5)     Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(6)     This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. §§ 1818(b), 1867(d), and 4631 and expressly does not form, and may not be construed to form, a contract binding the Comptroller, the Board of Governors, the FDIC, the OTS, or the FHFA or the United States.  Without limiting the foregoing, nothing in this Order shall affect any action against MERS, MERSCORP or officers, directors, or employees by a financial regulatory agency, the United States Department of Justice or any other law enforcement agency, to the extent permitted under applicable law.

(7)     The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

(8)     Nothing in the Stipulation and Consent or this Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

MERS Consent Order

-20-

benefit or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(9)     The provisions of this Order shall be binding upon MERSCORP and MERS and their successors and assigns.

(10)     MERS and MERSCORP consent to the issuance of this order before the filing of any notices, or taking of any testimony or adjudication, and solely for the purpose of settling this matter without a formal proceeding being filed.

IT IS SO ORDERED, this 13th day of April, 2011.

OFFICE OF THE COMPTROLLER OF THE CURRENCY

By:  /s/Joseph H. Evers
        Joseph H. Evers
        Deputy Comptroller for Large Bank Supervision

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

By:  /s/Jennifer J. Johnson
        Jennifer J. Johnson
        Secretary of the Board

FEDERAL DEPOSIT INSURANCE CORPORATION

By:  /s/Thomas J. Dujenski
  Thomas J. Dujenski
  Regional Director
  Atlanta Regional Office

OFFICE OF THRIFT SUPERVISION

By:  /s/Thomas A. Barnes
  Thomas A. Barnes
  Deputy Director
  Examinations, Supervision and Consumer Protection

FEDERAL HOUSING FINANCE AGENCY

By:  /s/Christopher H. Dickerson
  Christopher H. Dickerson
  Acting Deputy Director for Enterprise Regulation

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY
WASHINGTON, D.C.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

FEDERAL DEPOSIT INSURANCE CORPORATION
WASINGTON, D.C.

OFFICE OF THRIFT SUPERVISION
WASHINGTON, D.C.

FEDERAL HOUSING FINANCE AGENCY
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| MERSCORP, Inc., and the | ) |
| Mortgage Electronic Registration Systems, Inc., | ) |
| Reston, Virginia | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

OCC No. AA-EC-11-20
Board of Governors
Docket Nos. 11-051-B-SC-1,
11-051-B-SC-2

FDIC-11-194b

OTS No. 11-040

FHFA No. EAP-11-01

STIPULATION AND CONSENT TO THE ISSUANCE
OF A CONSENT ORDER

The Comptroller of the Currency of the United States of America ("Comptroller"

or "OCC"), and the Board of Governors of the Federal Reserve System ("Board of

Governors"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift

Supervision ("OTS"), and the Federal Housing Finance Agency ("FHFA") (collectively

MERS Stipulation

the "Agencies") intend to impose a cease and desist order on the Mortgage Electronic Registration Systems, Inc. ("MERS"), and its parent company, MERSCORP, Inc. ("MERSCORP"), pursuant to 12 U.S.C. § 1818(b), 12 U.S.C. § 1867(c)-(d), and 12 U.S.C. § 4631, for certain deficiencies and unsafe or unsound practices by MERS and MERSCORP that present financial, operational, compliance, legal and reputational risks t MERSCORP and MERS, and to MERSCORP's members.

MERS and MERSCORP, in the interest of compliance and cooperation, enter into this Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consent to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Agencies, through their authorized representatives, and MERS and MERSCORP, through their duly elected and acting Boards of Directors, stipulate and agree to the following:

## ARTICLE I
## JURISDICTION

For purposes of this Stipulation and the Consent Order:

(1)     MERS and MERSCORP are providers of services to depository institutions regularly examined by, or subsidiaries or affiliates of depository institutions subject to examination by the OCC, the Board of Governors, the FDIC, the OTS, and other appropriate Federal banking agencies, within the meaning of the Bank Service Company Act of 1962, 12 U.S.C. § 1867(c).

(2)     MERS and MERSCORP are each an "institution-affiliated party" within the meaning of 12 U.S.C. § 1813(u), and are each an "entity-affiliated party" within the meaning of 12 U.S.C. § 4502(11).

MERS Stipulation

2

(3)     The OCC, the Board of Governors, FDIC and OTS examined the services provided by MERS and MERSCORP to national banks and other financial institutions pursuant to the provisions of 12 U.S.C. § 1867(c).

(4)     The Agencies have authority to enter into this Consent Order pursuant to 12 U.S.C. §§ 1818(b), 1867(c)-(d) and 4631.

## ARTICLE II
## AGREEMENT

(1)     MERS and MERSCORP, without admitting or denying any wrongdoing, consent and agree to issuance of the Consent Order by the Agencies.

(2)     MERS and MERSCORP consent and agree that the Consent Order shall (a) be deemed an "order issued with the consent of the . ... institution-affiliated part[ies]" pursuant to 12 U.S.C. § 1818(h)(2) and an order to which an entity-affiliated party consents pursuant to 12 U.S.C. § 4633(a)(4); and (b) become effective upon its execution by the Agencies through their authorized representatives, and (c) be fully enforceable by the Agencies pursuant to 12 U.S.C. §§ 1818(i) and 1867(d), and 12 U.S.C. § 4631(f) and 4635.

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Agencies may enforce any of the commitments or obligations herein undertaken by MERS or MERSCORP under their supervisory powers, including 12 U.S.C. §§ 1818(i) and 1867(c)-(d), and 12 U.S.C. §§ 4631 and 4635, and not as a matter of contract law.  MERS and MERSCORP expressly acknowledge that MERS, MERSCORP, and the Agencies have no intention to enter into a contract.

MERS Stipulation

(4)     MERS and MERSCORP declare that no separate promise or inducement of any kind has been made by the Agencies, or by their agents or employees, to cause or induce MERS or MERSCORP to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     MERS and MERSCORP expressly acknowledge that no officer or employee of the Agencies has statutory or other authority to bind the United States, the United States Treasury Department, the Agencies, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Agencies' exercise of their supervisory responsibilities.

(6)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.  Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

## ARTICLE III
## WAIVERS

(1)     MERS and MERSCORP, by consenting to this Stipulation, waive:

(a)     the issuance of a Notice of Charges pursuant to 12 U.S.C. §§ 1818(b) and 4631(c);

(b)     any and all procedural rights available in connection with the issuance of the Consent Order;

(c)     all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 U.S.C. § 1867, 12 C.F.R. Part 19, and 12 U.S.C. § 4631(c);

MERS Stipulation

4

(d)    all rights to seek any type of administrative or judicial review of the Consent Order;

(e)    any and all claims for fees, costs or expenses against the Agencies, or any of their agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(f)    any and all rights to challenge or contest the validity of the Consent Order.

## ARTICLE IV
## OTHER PROVISIONS

(1)    The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Agencies from taking any other action affecting MERS or MERSCORP if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)    Nothing in this Stipulation shall preclude any proceedings brought by the Agencies to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, and neither MERS nor MERSCORP shall contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

MERS Stipulation

5

(3)     The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the signatory Agencies as their representatives, have hereunto set their hands on behalf of the Agencies.

OFFICE OF THE COMPTROLLER OF THE CURRENCY

/s/Joseph H. Evers                                    April 13, 2011
_____          _____
By: Joseph H. Evers                                   Date
    Deputy Comptroller for
    Large Bank Supervision

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

/s/Jennifer J. Johnson                                April 13, 2011
_____          _____
By: Jennifer J. Johnson                               Date
    Secretary of the Board

FEDERAL DEPOSIT INSURANCE CORPORATION

/s/Thomas J. Dujenski                                 April 13, 2011
_____          _____
By: Thomas J. Dujenski                                Date
    Regional Director
    Atlanta Regional Office

MERS Stipulation

OFFICE OF THRIFT SUPERVISION

/s/Thomas A. Barnes
By: Thomas A. Barnes                          April 13, 2011
     Deputy Director                              Date
     Examinations,
     Supervisions and
     Consumer Protection


FEDERAL HOUSING FINANCE AGENCY


 /s/Christopher H. Dickerson
By: Christopher H. Dickerson                    April 13, 2011
     Acting Deputy Director for Enterprise Regulation    Date


IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Boards of

Directors of MERS and MERSCORP, have hereunto set their hands on behalf of MERS

and MERSCORP.

For MERSCORP:


 /s/Diane Citron
Diane Citron                                   April 12, 2011
MERSCORP                                          Date


 /s/John Courson
John Courson                                   April 12, 2011
MERSCORP                                          Date


 /s/Joe Jackson
Joe Jackson                                    April 12, 2011
MERSCORP                                          Date
MERS Stipulation

7

/s/Brian McCrackin    April 12, 2011
Brian McCrackin     Date
MERSCORP


/s/Kurt Pfotenhauer    April 12, 2011
Kurt Pfotenhauer     Date
MERSCORP


/s/Robert Reynolds    April 12, 2011
Robert Reynolds     Date
MERSCORP


/s/Joseph Rossi    April 12, 2011
Joseph Rossi     Date
MERSCORP


/s/Steven Stein    April 12, 2011
Steven Stein     Date
MERSCORP


/s/Marianne Sullivan    April 12, 2011
Marianne Sullivan     Date
MERSCORP


/s/Larry Washington    April 12, 2011
Larry Washington     Date
MERSCORP


For MERS:


MERS Stipulation

8

 /s/John Courson
John Courson
MERS

April 12, 2011
Date


 /s/Edward Kramer
Edward Kramer
MERS

April 12, 2011
Date


 /s/Kurt Pfotenhauer
Kurt Pfotenhauer
MERS

April 12, 2011
Date


 /s/Marianne Sullivan
Marianne Sullivan
MERS

April 12, 2011
Date


 /s/Joseph Rossi
Joseph Rossi
MERS

April 12, 2011
Date


MERS Stipulation

# EXHIBIT H, ORDER
# CERTIFYING QUESTION

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KRISTIN BAIN,

Plaintiff,

v.

METROPOLITAN MORTGAGE
GROUP INC. et al.,

Defendants.

CASE NO. C09-0149-JCC

ORDER CERTIFYING QUESTION
TO THE WASHINGTON SUPREME
COURT

KEVIN SELKOWITZ,

Plaintiff,

v.

LITTON LOAN SERVICING LP et al.,

Defendants.

CASE NO. 10-5523-JCC

I.    **BACKGROUND**

    This Court previously ordered the parties in *Bain v. Metropolitan Mortgage Group Inc.*,

No. C09-0149-JCC (W.D. Wash. removed Feb. 3, 2009), to show cause why this Court should

ORDER CERTIFYING QUESTION TO THE
WASHINGTON SUPREME COURT
PAGE - 1

1  not decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. In its order, the

2  Court asked the parties to identify whether Washington law addresses Mortgage Electronic

3  Registration Systems' (MERS)—and similar organizations'—ability to serve as the beneficiary

4  and nominee of the lender under Washington's Deed of Trust Act when it does not hold the

5  promissory note secured by the deed of trust. (Dkt. No. 130.) The Court also ordered the parties

6  to identify whether Washington law addresses the legal effect in a nonjudicial foreclosure of an

7  unauthorized beneficiary's appointment of a successor trustee. (*Id.*) The parties' responses

8  demonstrated that Washington law does not specifically address these issues.

9        This Court later learned that a Washington Superior Court certified to the Washington

10  Supreme Court similar (if not identical) questions involving MERS's role in the foreclosure

11  process, namely, whether MERS was a lawful beneficiary under Washington's Deed of Trust

12  Act and, if not, the resulting legal effect of the unlawful beneficiary. This Court stayed its cases

13  involving MERS pending resolution by the Washington Supreme Court. *Bain v. Metropolitan*

14  *Mortgage Group Inc.*, No. C09-0149-JCC (W.D. Wash. removed Feb. 3, 2009) (Dkt. No. 155);

15  *Selkowitz v. Litton Loan Servicing LP*, No. C10-5523-JCC (W.D. Wash. removed July 27, 2010)

16  (Dkt. No. 39).

17        On April 25, 2011, the Commissioner of the Washington Supreme Court, Steven Goff,

18  entered a ruling denying discretionary review of the Superior Court's certified question. Under

19  Washington Rule of Appellate Procedure 2.3(a), "a party may seek discretionary review of any

20  act of the superior court not appealable as a matter of right." The Commissioner concluded that

21  because the Superior Court had not yet ruled on the merits of the MERS issue, there was no "act"

22  of the Superior Court on which to seek discretionary review.

23        Although the Superior Court's certification was not the proper vehicle for review by the

24  Washington Supreme Court, the Commissioner described both the importance of the legal

25  questions posed by the Superior Court as well as the probability that the Washington Supreme

26  Court would eventually address the issue:

I agree with Mr. Vinluan that whether MERS can be a deed of trust beneficiary under Washington law is an important issue that deserves resolution, probably by this court. It appears that there is considerable ongoing foreclosure litigation on the point in both state and federal courts, with no authority from this court [or] the Court of Appeals to guide those decisions.

*Vinluan v. Fidelity Nat'l Title & Escrow Co.*, No. 85637-1, at *4 (Wash. Apr. 25, 2011) (ruling denying review).[1]

## II.   CERTIFICATION

Pursuant to Washington Revised Code section 2.60.020,

When in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined, such federal court may certify to the supreme court for answer the question of local law involved and the supreme court shall render its opinion in answer thereto.

The certification process serves the important judicial interests of efficiency and comity. As noted by the United States Supreme Court, certification saves "time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). Because this matter involves important and far-reaching issues of first impression regarding MERS's ability to serve as the beneficiary and nominee of the lender under Washington's Deed of Trust Act, this matter should be presented for expedited review to the Washington Supreme Court. The following questions are hereby certified to the Washington Supreme Court:

1. Is Mortgage Electronic Registration Systems, Inc., a lawful "beneficiary" within the terms of Washington's Deed of Trust Act, Revised Code of Washington section 61.24.005(2), if it never held the promissory note secured by the deed of trust?

---

[1] The Commissioner also noted that this Court had stayed its cases pending the Washington Supreme Court's decision whether to accept certification from the Superior Court.

PAGE - 3

2.  If so, what is the legal effect of Mortgage Electronic Registration Systems, Inc., acting as an unlawful beneficiary under the terms of Washington's Deed of Trust Act?

3.  Does a homeowner possess a cause of action under Washington's Consumer Protection Act against Mortgage Electronic Registration Systems, Inc., if MERS acts as an unlawful beneficiary under the terms of Washington's Deed of Trust Act?

This Court does not intend its framing of the questions to restrict the Washington Supreme Court's consideration of any issues that it determines are relevant. If the Washington Supreme Court decides to consider the certified questions, it may in its discretion reformulate the questions. *See Affiliated FM Ins. Co. v. LTK Consulting Servs. Inc.*, 556 F.3d 920, 922 (9th Cir. 2009). Further, this Court leaves to the sound discretion of the Washington Supreme Court the choice of which of the two (or both) of the above-captioned cases it believes serves as the preferable vehicle through which to resolve the questions posed.

The Clerk of Court is directed to submit to the Washington Supreme Court certified copies of this Order; a copy of the docket in the above-captioned matters; Docket Numbers 1, 10, 21, 22, 24, 30, 31, 39, 41, 42, 44, 48, 57, 62, 65–69, 77, 79, 80, 82, 86–88, 90, 91, 94, 96, 98, 99, 102, 104, 107–109, 111, 112, 116–118, 120, 122, 123, 128, 130, 131, 132, 138–146, 148, 149, 153, 155, and 156 in Case No. 09-0149-JCC; and Docket Numbers 7–9, 12–17, 20–31, 33, and 38 in Case No. C10-5523-JCC. The record so compiled contains all matters in the pending causes deemed material for consideration of the local-law questions certified for answer.

This Court STAYS these actions until the Washington Supreme Court answers the certified questions.

DATED this 24th day of June 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

FILED

12 SEP -4  AH 11: 01

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH



**CL15330131**

SUPERIOR COURT, IN AND FOR THE COUNTY OF SNOHOMISH, STATE OF WASHINGTON

| | |
|---|---|
| **JONELLE MCCROREY, ET AL.** | Hearing Date: |
| Plaintiff/Petitioner | CAUSE NO: **12-2-07402-8** |
| | AFFIDAVIT OF SERVICE OF: |
| vs. | **SUMMONS; COMPLAINT; PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE;** |
| **FEDERAL NATIONAL MORTGAGE ASSOCIATION, ET AL.** | |
| Defendant/Respondent | |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, has the authority to serve pleadings in the State named below, and is competent to be a witness therein.

**On the 29th day of August, 2012, at 2:54 PM, at the address of 5950 E PACES FERRY Road SUITE 1800, ATLANTA, Fulton County, GA 30326; this affiant served the above described documents upon FEDERAL NATIONAL MORTGAGE ASSOCIATION by then and there personally delivering 1 true and correct copy(ies) thereof, by then presenting to and leaving the same with Mrs Griffin, LEGAL DEPT., a red-headed white female approx. 55-65 years of age, 5'4"-5'8" tall and weighing 120-160 lbs..**

No Information was provided or discovered that indicates that the subjects served are members of the U.S. military.

Affiant hereby states under penalty of perjury under the laws of the State of Washington that the statement above is true and correct.

DATED this 29th day of August, 2012.

Hollis Hill, Fulton, GA

Service Fee Total: $

SUBSCRIBED AND SWORN to before me this 29 day of Aug, 20 12

_____
NOTARY PUBLIC in and for the State of Georgia

FOR: **Triad Law Group**
**REF: MCCROREY**

ORIGINAL AFFIDAVIT OF
SERVICE



Tracking #: **7467817 SEA FIL**



FILED

SEP 1 4 2012

SONYA KRASKI
COUNTY CLERK
SNOHOMISH CO. WASH

1

2

3

4

5        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
         IN AND FOR THE COUNTY OF SNOHOMISH

6

7    JONELLE McCROREY; JEFF McCROREY
     and DANELLE McCROREY, husband and wife,
                                                      No. 12-2-07402-8
8                        Plaintiffs,

9        v.                                           NOTICE OF APPEARANCE

10   FEDERAL NATIONAL MORTGAGE
     ASSOCIATION; NATIONSTAR MORTGAGE;
11   FLAGSTAR BANK, F.S.B.; MORTGAGE
     ELECTRONIC REGISTRATION SYSTEMS,
12   INC.,

13                       Defendant.

14

15   TO:         Plaintiffs above-named;

16   AND TO:     Wesley Foreman, Triad Law Group, as attorney of record for said plaintiffs

17          YOU AND EACH OF YOU will please take notice that defendant Flagstar Bank, F.S.B.

18   hereby appears in the above-entitled action and requests that all further papers and pleadings,

19   except original process, be served upon the undersigned attorneys at the address below stated.

20          DATED this ___14th___ day of September, 2012.

21                                    Davis Wright Tremaine LLP
                                      Attorneys for Defendants Flagstar Bank, F.S.B.
22

23

24                                    By _____
                                         Fred B. Burnside, WSBA #32491
25                                       Joshua A. Rataezyk, WSBA #33046

26

27

NOTICE OF APPEARANCE - 1
DWT 20329971v1 0093128-000024

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that I caused the document to which this certificate is attached to be

3  delivered to the following as indicated:

4
      Wesley Foreman                    ☐ Messenger
5     Triad Law Group                   ☐ U.S. Mail, postage prepaid
      209 Dayton Street, Suite 105      ☒ Federal Express
6     Edmonds, Washington 98020         ☐ Facsimile
                                        ☐ Email
7
      Declared under penalty of perjury under the laws of the state of Washington dated at Seattle,
8
   Washington this 13ᵗʰ day of September, 2012.

9

10                                           _Gail Kataoka_
                                             Gail Kataoka

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

NOTICE OF APPEARANCE - 2
DWT 20329971v1 0093128-000024

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700